Robert LARSEN et al., Plaintiffs,

v.

Martin R. HOFFMAN et al., Defendants.

Ralph S. BRYNER et al., Plaintiffs,

v.

Martin R. HOFFMAN et al., Defendants.

Civ. A. Nos. 76–0610, 76–0924.

United States District Court,
District of Columbia.

March 30, 1977.

Keith A. Rosenberg, Rockville, Md., for plaintiffs.

Nathan M. Norton, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

CORCORAN, District Judge.

### I

Plaintiffs in these consolidated actions are Reserve officers [1] in the United States Army who were serving on active duty in commissioned status until they were terminated from active duty in late 1975 by reason of two consecutive non-selections ("pass-overs") for promotion to the next higher temporary grade. Had they not been so terminated, plaintiffs would have completed eighteen years of creditable active duty service and been within two years of becoming eligible for retired pay. Under such circumstances, they would not be subject to involuntary release from active duty before becoming eligible for such pay, unless their releases were approved by the Secretary.[2]

The pertinent facts may be outlined as follows.

During 1974 and 1975, the plaintiffs were among Reserve officers within "zones of consideration" [3] for temporary promotion to the next higher grade. In 1974, plaintiffs were notified that as a result of actions taken by 1974 Promotion Selection Boards,[4] they were among those officers who had been considered but not selected, and that their non-selections constituted passovers for promotion as defined in AR 624-100. Plaintiffs were further notified in 1975 that as a result of their second non-selection for promotion by the 1975 Promotion Selection Boards, Army policy required their release from active duty on the ninetieth day after receipt of notification, Sec. XVII, Ch. 3, AR 635-100.

On September 24, 1975, prior to their release from extended active duty in commissioned status, the plaintiffs filed applications with the Army Board for Correction of Military Records [ABCMR] seeking correction of their service records, pursuant to 10 U.S.C. § 1552 and AR 15-185. Subsequent to filing their ABCMR applications, plaintiffs ascertained that the 1974 and 1975 Promotion Selection Boards which had passed them over for promotion failed to include Reserve officers as members as required by statute, Department of Defense Instruction and Army Regulation.[5] Plain-

---

1. AR 135-215, ¶ 1-5(b) defines the term officer to include "[a]ll commissioned officers and warrant officers of the Reserve components except when otherwise specified." Through temporary promotions in the Army, plaintiffs had attained the grades of Major, Captain, Warrant Officer, or Chief Warrant Officer.

2. See 10 U.S.C. § 1163(d), AR 624-100, and AR 635-100.

3. Under Army Regulations, recommendations for promotion are made from "zones of consideration" composed of officers who attained a certain rank after a specified date. See AR 624-100 ¶ 14, 16.

4. Review of officers' qualifications for promotion is conducted by a board of officers senior in rank to those being considered. This promotion selection board reviews the records of all eligible officers within the zone of consideration and prepares a list of those recommended for promotion, based on the board's collective judgment as to which officers are "best qualified" of those eligible. See AR 624-100, ¶ 18a(1). Officers determined not to be among the "best qualified" are not recommended, that is, they are "passed-over", for promotion. Reserve officers twice consecutively considered for promotion and not recommended by the board are relieved from active duty. Plaintiffs were among such officers.

5. Under the provisions of 10 U.S.C. § 266, it is stated that:

Each board convened for the appointment, promotion, demotion, involuntary release from active duty, discharge, or retirement of Reserves shall include an appropriate number of Reserves, as prescribed by the Secretary concerned under standards and policies prescribed by the Secretary of Defense.

Pursuant to the requirements of this statute, the Secretary of Defense issued Department of Defense Instruction No. 1205.4, dated June 23, 1959, which provides, in pertinent part, as follows:

A. All boards convened for the appointment, promotion, demotion, involuntary release from active duty, discharge, or retirement of members of the reserve components shall be constituted as prescribed by the appropriate secretary, and shall include appropriate numbers of members from the reserve components.

B. The intent of the Congress in this Section is clear, that a member of a reserve component who is the subject of any of the indicated board actions shall be assured a fair

tiffs thereupon supplemented their ABCMR applications on October 28, 1975, setting forth the absence of Reserve officers from membership of the boards, and requesting withdrawal of notifications of release from active duty. They each claimed retroactive pay and appropriate allowances, the voiding of their non-selections for promotion to the next higher grade, correction of military records to show selection for and promotion to the next higher grade, and such other and additional relief as might be appropriate.

A hearing on plaintiffs' applications, as supplemented, was conducted before the ABCMR on December 10, 1975.[6] The ABCMR subsequently issued findings and recommendations on plaintiffs' applications which were forwarded to the Secretary of the Army. With respect to the lack of Reserve officers on the 1974 and 1975 promotion selection boards, the ABCMR's findings and conclusions were as follows:

6. That with respect to the sixth issue, Title 10 U.S.C. Section 266(a), does provide that all boards convened for appointment, promotion, demotion, involuntary release from active duty, et cetera, of Reserves shall include an appropriate number of Reserves as prescribed by the Secretary concerned under the standards and procedures established by the Secretary of Defense; that DOD Instruction 1205.4 dated 23 June 1959 does establish the policy that boards convened for the appointment, promotion, demotion, involuntary release from active duty, et cet-

era, of Reserves shall be constituted as prescribed by the appropriate Secretary and shall include appropriate numbers of members from the Reserve Components; and that AR 624–100 does prescribe that whenever the zone of consideration includes non-regular officers, selection boards will, where practicable, include at least one officer of the Reserve Components. That while it appears that the Department may not have complied with the intent of the law to have an appropriate number of Reserve Component members on the 1974 and 1975 promotion boards when considering Reserve Officers, the written depositions of selection board members indicate that an individual's component had little or no bearing in their consideration and selection of an officer for promotion. Further it appears from a review of the entire matter that any decision or other action by the Department to omit Reserve officers from promotion selection boards was not done in any arbitrary or capricious manner or with malicious intent to harm or prejudice the applicants' promotion chances as Reservists. That the Department's interpretation of "where practicable" has been construed to mean "qualified and available" to serve as a board member and such interpretation appears to be reasonable; however, the information submitted for consideration of this Board fails to show that there were no qualified Reserve officers, or that such officers were not avail-

---

representation of reserve membership on the board. The Secretaries of the military departments will, with due regard to availability of qualified reservists, pertinent statutory provisions, the nature of the board action, and categories, regular and reserve, which may be considered by the board, provide in the membership of the indicated boards, to the fullest practicable extent, a fair and adequate representation of members from the reserve components.

With regard to the composition of promotion selection boards, Army Regulation 624–100 states, at paragraph 16(b)(5):

Whenever a zone of consideration includes non-Regular officers, selection boards will, where practicable, include at least one officer of the reserve components.

6. Between the date of filing the initial ABCMR applications and this December, 1975 hearing, each of the plaintiffs had been released from active duty. Each of the plaintiffs, with the exception of plaintiff Tomczyk, received statutorily authorized severance pay in the amount of $15,000.00. See 10 U.S.C. § 687(a). The plaintiffs in Bryner, subsequent to termination, exercised their option to re-enlist in the Regular Army or for appointment as Warrant Officer and, consequently, all, with the exception of plaintiff Tomczyk, also received appropriate re-enlistment bonuses. Since termination, the plaintiffs in Larsen claim to have been unable to obtain civilian employment consistent with their military training and experience.

able to serve on promotion Boards; indeed, it appears from testimony submitted to this Board that a reasonably diligent search would have been successful in locating at least one Reserve Officer who met the qualification standards and was available to serve as a selection board member. That in viewing the situation in the most favorable light to the applicants, it is apparent the absence of Reservists from the 1974 and 1975 selection boards may have deprived them of consideration in a manner intended; that although the applicants have not shown that they have been harmed because there was no Reserve Officer on the board, the failure to have a Reserve Officer as a member of the selection board raises some doubt as to whether the applicants were accorded proper consideration for promotion under the 1974 and 1975 promotion criterion.

7. That in view of the foregoing findings and conclusions, the failure of the Department to appoint an appropriate number of Reserve Officers as members of the 1974 and 1975 selection boards has resulted in an injustice to the applicants in that it has deprived them of consideration for promotion by selection boards containing Reserve Officers. ABCMR Proceedings, 10 December 1975, at 21–22.

On that basis, the ABCMR recommended that new Army Promotion Selection Boards [Reconstituted Boards] be convened, with an appropriate number of Reserve officers as members, to reconsider plaintiffs and others similarly situated on the basis of reconstituted military records (omitting reference to previous selection or non-selection for promotion) and under 1974 and 1975 Selection Board criteria. *Id.,* at 22. The ABCMR further advised that the names of officers and warrant officers who were previously not selected for promotion should be reported back to the ABCMR, after favorable or unfavorable action by the Reconstituted Boards, for appropriate corrective action or further administrative proceedings, as the case might be. *Id.,* at 22–23. However, the ABCMR made neither findings nor recommendations relative to the plaintiffs' request for immediate, retroactive restoration to active duty in a commissioned status without loss of active duty commissioned service and for adjustment of back pay and allowances.

The Secretary of the Army approved in full the ABCMR's findings, conclusions, and recommendations and, on January 27, 1976, issued a memorandum to the Chief of Staff directing him to convene Reconstituted Boards in accordance with the ABCMR's recommendations. However, the Secretary also ordered that any officer whose date for discharge from active duty in commissioned status (because of non-selections by either or both of the 1974 and 1975 Promotion Selection Boards) fell after the date of the Secretary's approval of the ABCMR findings and recommendations and memorandum to the Chief of Staff, should be retained on active duty pending completion of reviews by the Reconstituted Boards.[7]

On April 13, and May 24, 1976, plaintiffs commenced present actions against the Secretary of the Army and the United States for declaratory and equitable relief, correction of military records, and back pay and allowances.[8] District Court jurisdiction is premised upon 28 U.S.C. §§ 1331 (federal question), 1361 (mandamus), 1346 (civil action against United States), 2201–02 (declaratory judgments), the Privacy Act, 5 U.S.C. § 552a, 10 U.S.C. §§ 266, 277, 3441–3452 (reserve components and temporary appointments), Army Regulations 624–100 and 635–100, Department of Defense Instruction 1205.4, and the Fifth Amendment to the Constitution.

---

**7.** None of the plaintiffs in these actions comes within this exception.

**8.** Subsequent to the filing of these complaints, plaintiff Ralph S. Bryner in No. 76–0924, and plaintiffs Jimmie R. Eckard and Dennis G. Porche in No. 76–0610, were selected for promotion by the Reconstituted Boards, with entitlement to back pay, allowances, and credit for time served. On October 8, 1976, we dismissed as to defendant Porche. With respect to plaintiffs Bryner and Eckard, the complaints will be dismissed as moot.

The parties have filed cross-motions for summary judgment and defendants, alternatively, have moved to dismiss for lack of subject matter jurisdiction.

## II

The principal issue presented by defendants' motion to dismiss is whether this Court has jurisdiction over the claims of plaintiffs for back pay, allowances and concomitant reinstatement since the Tucker Act,[9] 28 U.S.C. § 1346(a)(2), confers jurisdiction upon district courts only over claims against the United States not exceeding $10,000 in amount.

Plaintiffs take the position that (a) their complaint essentially seeks reinstatement, rather than back pay and allowances, and so under the rule set forth in *Melvin v. Laird*, 365 F.Supp. 511 (E.D.N.Y.1973), the district courts may properly exercise jurisdiction; (b) to arrive at the relevant amount in controversy for Tucker Act purposes, their individual retroactive wage and allowance claims must be reduced by appropriate set-offs, counterclaims and credits; and (c) even if this Court is without jurisdiction under the Tucker Act, several alternative jurisdictional provisions permit maintenance of the present litigation in the district court. For reasons discussed below we reject each of the plaintiffs' contentions.

## III

In their attempt to characterize this litigation as fundamentally declaratory and mandamus actions in which the claims for money damages against the United States are merely incidental, plaintiffs' place exclusive reliance upon *Melvin v. Laird, supra*. The circumstances of the instant case, however, are legally and factually distinguishable.

The plaintiff in the *Melvin* case challenged, on constitutional grounds, a larceny conviction by a general-court martial in 1954, and requested a declaratory judgment and writ of *habeas corpus* from the district court setting aside the conviction as void. Significantly, Melvin made no claim for either back pay or retirement benefits. In holding that its *present* jurisdiction collaterally to review Melvin's conviction was not preempted by the *conjectural* possibility of future claims for monetary relief (over which the Court of Claims would have exclusive jurisdiction), the district court emphasized:

> [P]laintiff does not seek monetary relief at all. He seeks only collateral review of his conviction by this court, based upon his claim that he was deprived of his constitutional rights to confront his accusers and to effective assistance of counsel. Plaintiff may seek back pay at a later date; but whether he does or not, and whatever amount he may seek, this court's jurisdiction to determine the issues now before it is not affected. 365 F.Supp. at 520.

Plaintiff's reliance on the *Melvin* case is obviously misplaced. In contrast to the facts before the trial court in *Melvin*, there is no need in the instant cases to speculate concerning future claims for monetary relief against the United States; those claims are specifically pleaded by plaintiffs for present adjudication by this Court.

The decision of the Fifth Circuit in *Carter v. Seamans*, 411 F.2d 767 (1969), *cert. denied*, 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970), which was distinguished in *Melvin* (and not mentioned in the briefs), provides surer guidance in evaluating plaintiffs' contentions.[10] Carter, a former Air Force Captain, filed a complaint in the district court requesting a declaratory judgment that his discharge under conditions other than honorable was a nullity and that he continued to hold his former rank at all times since his December, 1960 discharge. The plaintiff also sought correction of military records to reflect promotions at regu-

---

9. *See also* 28 U.S.C. §§ 507, 1402, 1491, 1496, 1497, 1501, 1503, 2071, 2072, 2411, 2501, and 2512.

10. *See also, Parrish v. Seamans*, 343 F.Supp. 1087 (D.S.C.1972), *aff'd*, 485 F.2d 571 (4th Cir. 1973); *Mathis v. Laird*, 483 F.2d 943 (9th Cir. 1973).

lar intervals and an injunction restraining the Secretary of the Air Force from withholding pay and allowances which would have been earned during the relevant period or might accrue in the future.[11]  Defendant moved for summary judgment arguing, *inter alia*, that insofar as the case represented a claim for monetary relief, the district court lacked jurisdiction by reason of the fact that the amount in controversy exceeded Tucker Act limitations.  Concluding that Carter's claim for money damages against the United States was "the keystone of [the] entire lawsuit," the district court[12] reasoned:

> .  .  .  the initial inquiry must be to what extent, if at all, this case represents a claim for monetary relief.  The pivotal theory around which Plaintiff's entire case revolves is that his separation from the Air Force was so fundamentally defective as to be a complete legal nullity.  Plaintiff, thus, is challenging the *fact* of discharge rather than merely its character.  Inherent in this theory is the contention that Plaintiff has been, in contemplation of law at least, an officer on active duty status at all times since December, 1960.  If this theory is accepted and carried to its logical consequence, as Plaintiff insists it must, the result would be that Carter is entitled to full pay and allowances from the last day of 1960 to the present.  Hence, by virtue of Plaintiff's theory of the case, a decision by this court concerning the validity of the discharge necessarily involves an adjudication of the claims for back wages.  This view is buttressed by the nature of the relief prayed for.  411 F.2d at 771 (emphasis in original).

For those reasons, the district judge declined to exercise mandamus jurisdiction, which might undermine the otherwise exclusive jurisdiction of the Court of Claims, and dismissed the complaint without prejudice to proceedings in that forum.  The Court of Appeals, *per curiam*, finding no abuse of discretion, summarily affirmed.

■  Applying the reasoning of the *Carter* court to the present litigation, we conclude that plaintiffs' claims for back pay and allowances are the essence of these consolidated cases.  A declaration by this court that the *fact* of plaintiffs' terminations from active duty was, as they suggest, void *ab initio*, would immediately and necessarily entitle them to the full measure of monetary relief requested.  That their complaints have also been cast in terms of declaratory and equitable relief does not alter the substance of that which they seek—a money judgment against the United States.  That being so, it becomes necessary to ascertain whether the individual claims of the several plaintiffs are of amounts within the limitations of the Tucker Act.  That determination necessitates inquiry not only into our jurisdiction under 28 U.S.C. § 1346(a)(2), but also into that of the Court of Claims under 28 U.S.C. § 1491.

## IV

Prior to 1964, government employees seeking declaratory and equitable relief for restoration to former positions after illegal discharge, as well as back pay for the discharge period, were required to bifurcate the monetary and non-monetary claims into separate actions—one to be pursued in the Court of Claims and the other to be pursued in the district court.  Since that time, however, the competence of district courts to enter money judgments against the United States and the authority of the Court of Claims to direct restoration to office and correction of employment records in such cases have been significantly enhanced.

On August 30, 1964, the Congress enacted Public Law 88–519, 78 Stat. 699.  It deleted former provisions of section 1346(a)(2) of Title 28 prohibiting district courts from hearing civil actions on claims to recover fees, salary or compensation for the official

---

**11.**  Carter had previously filed a petition seeking identical relief in the Court of Claims.  That court stayed its proceedings pending disposition of Carter's district court action.

**12.**  The trial court's memorandum has been incorporated by reference in the Fifth Circuit's opinion and published as an appendix thereto.  *See, gen.*, 411 F.2d at 769–76.

services of Federal Government officers and employees and effectively expanded the jurisdiction of the district courts to enter money judgments in such cases, subject to the express dollar amount limitation of section 1346. That provision of the Tucker Act, *as amended,* currently provides that district courts shall have original jurisdiction, concurrent with the Court of Claims, of "[a]ny . . . action or claim against the United States, *not exceeding $10,000 in amount,* founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1346(a)(2). (Emphasis supplied).

However, until 1972, dissatisfied government employees still had to file separate suits in different courts if their money claims exceeded $10,000 since the Court of Claims lacked subject matter jurisdiction over requests for non-monetary relief. *See, e. g., United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). That cumbersome requirement was rectified in larger measure when on August 29, 1972, Congress enlarged the authority of the Court of Claims under 28 U.S.C. § 1491 to encompass the power to render certain forms of non-monetary relief as an incident of and collateral to its jurisdiction over claims for money judgments. Pub.L. 92–415, 86 Stat. 652. Thus, in addition to the Court of Claims' original jurisdiction "to render judgment upon any claim against the United States" which is founded on the Constitution, act of Congress, executive regulation, contract with the United States, etc., section 1491, *as amended,* presently states that:

> To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just.

■ When this section is read in conjunction with other provisions of the Tucker Act, it becomes apparent that the measure of relief available to the illegally discharged employee is identical in either court. However, where the employee's suit *essentially* presents a claim for a money judgment, as in the present case, exclusive jurisdiction over the monetary claim lies in the Court of Claims, unless the civil action or monetary claim does not exceed $10,000 in amount. Hence, the critical inquiry in such cases is whether the plaintiff's claim for a money judgment falls within or without the dollar limitation of the Tucker Act.

That issue usually can be resolved by reference to the jurisdictional allegations of the complaint. The pleadings in the instant cases, however, tend to obfuscate rather than crystallize the matter.

Although the complaints in *Larsen* and *Bryner* premise jurisdiction upon a number of code provisions which require an amount in controversy in excess of $10,000, nowhere in either pleading is it alleged that the matters in controversy exceed that jurisdictional amount. In fact, the only allusion in either case to an amount in controversy appears at paragraph D of the prayers for relief, identical in both complaints, where it is requested that injunctions be issued "[t]o order the Secretary, in conjunction with the relief requested in paragraph 'B' [*i. e.,* retroactive reinstatement and correction of records], to correct Plaintiffs' records in such fashion as appropriate so as to restore, or cease withholding, all pay and allowances at the grade held at the date of release, to include relocation costs applicable under the appropriate regulations from the date of release to the date of reinstatement less appropriate set-offs and counterclaims." [13]

---

13. While such allegations of jurisdictional amount may or may not be proper in Court of Claims practice, *see* 4 *Bender, Fed.Practice Forms,* No. 4326.4; 3 *Fed.Practice Forms*

During oral argument on the several motions filed in the action, plaintiffs' counsel submitted affidavits which detailed, as to each plaintiff, his back pay and allowances computed from the date of termination, amounts received as severance pay, and actual and projected earnings from civilian employment, as to the plaintiffs in *Larsen,* and enlistment pay, as to the plaintiffs in *Bryner.* On the basis of these affidavits, plaintiffs have fashioned an ingenious argument regarding the method for determining jurisdictional amounts under sections 1346(a)(2) and 1491.

The plaintiffs concede that, in the event of a favorable judgment, their individual entitlements to accrued wages and allowances from the dates of termination from active duty status would substantially exceed the Tucker Act limitation and, in most instances, would add up to more than $20,-000.[14] It is argued, however, that the back pay and allowance claims must be diminished by that amount equal to severance pay or reinlistment bonuses received and civilian or reinlistment earnings in mitigation of damages. Once such a netting-out process has been performed, it is claimed the resulting amounts would be less than $10,000 for

each plaintiff, with negative entitlements (representing amounts repayable to the government if reinstated) in the case of several plaintiffs in *Larsen* and all but one in *Bryner.*[15] In essence, therefore, plaintiffs seek to diminish the amounts of their claims for monetary damages by anticipating the government's possible set-offs and counter demands.[16] We perceive substantial deficiencies in plaintiffs' proposed formula for computing the amount of their claims for Tucker Act purposes.

■ Under the traditional, majority rule for ascertaining jurisdictional amount in federal question and diversity litigation, the possibility of government set-offs and other demands are as irrelevant as the appearance of a valid defense reducing the amount claimed or the occurrence of an event subsequent to the complaint affecting the amount in controversy. *See e. g., Schunk v. Moline, Milburne & Stoddart Co.,* 147 U.S. 500, 13 S.Ct. 416, 37 L.Ed. 255 (1893); *Anderson v. Moorer,* 372 F.2d 747 (5th Cir. 1967); *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938); *Smithers v. Smith,* 204 U.S. 632, 27 S.Ct. 297, 51 L.Ed. 656

§§ 5:121–5:132, we have serious reservations as to their sufficiency under the Federal Rules of Civil Procedure. *See, e. g., Fed.R.Civ.P.* 8(a); *Id.,* Appendix of Forms, No. 2(b); 1 *Moore's Fed.Practice* ¶ 0.92[1], n. 9–12.

**14.** Without expressing opinion on the propriety of waiving the excess of Tucker Act claims above $10,000 in order to permit retention of district court jurisdiction, we note that no such waiver has been proposed by plaintiffs in this case. *See Sutcliffe Storage and Warehouse Co. v. United States,* 162 F.2d 849 (1st Cir. 1947); *United States v. Johnson,* 153 F.2d 846 (9th Cir. 1946); *Jones v. United States,* 127 F.Supp. 31 (E.D.N.C.1954); *Perry v. United States,* 308 F.Supp. 245, 247 (D.Colo.1970), aff'd, 442 F.2d 353 (10th Cir. 1971); *Hill v. United States,* 40 F. 441 (D.Mass.1889); *Hammond-Knowlton v. United States,* 121 F.2d 192 (2d Cir. 1941); *Wolak v. United States,* 366 F.Supp. 1106 (D.Conn.1973); *McClendon v. Blount,* 452 F.2d 381 (7th Cir. 1971).

**15.** The defendants concede that if the suggested method of computation is adopted, the net recovery of individual plaintiffs would be less

than $10,000. However, defendants adamantly contend that such claims for monetary relief must be computed for Tucker Act purposes without reference to set-offs, counterclaims, etc. which may be asserted by the United States.

**16.** In Court of Claims practice, civilian earnings mitigating damages in back pay cases are treated as "equitable offsets" which, as in the case of claims, counterclaims, third-party claims, or any separate issue, may be reserved for separate proceedings as to the amount of damages subsequent to trial or summary judgment on the issue of liability. *See* Court of Claims Rules 131(c), 101(d); *Motto v. United States,* 360 F.2d 643, 645–46, 172 Ct.Cl. 862 (1966); *see also Yee v. United States,* 512 F.2d 1383, 1388–89 (Ct.Cl.1975); *Egan v. United States,* 158 F.Supp. 377, 141 Ct.Cl. 1 (1958); *Clackum v. United States,* 161 Ct.Cl. 34 (1963); *Garner v. United States,* 161 Ct.Cl. 73 (1963); *Middleton v. United States,* 175 Ct.Cl. 786 (1966); *Borak v. United States,* 78 F.Supp. 123, 110 Ct.Cl. 236 (1948) *cert. denied,* 335 U.S. 821, 69 S.Ct. 43, 93 L.Ed. 375; *Kaufman v. United States,* 93 F.Supp. 1019, 118 Ct.Cl. 91 (1950).

(1907); *Tising v. Flanagin,* 360 F.Supp. 283 (E.D.Wisc.1973); *McDonald v. Patton,* 240 F.2d 424 (4th Cir. 1957); *Kansas City Philharmonic Ass'n v. Greyhound Lines,* 257 F.Supp. 941 (W.D.Mo.1966); *Umbenhouser v. Mutual of Omaha Ins. Co.,* 298 F.Supp. 927 (W.D.Mo.1969); *Burton Lines, Inc. v. Mansky,* 265 F.Supp. 489 (M.D.N.C.1967); *Continental Carriers, Inc. v. Goodpasture,* 169 F.Supp. 602 (M.D.Ga.1959); *West Virginia State Bar v. Bostic,* 351 F.Supp. 1118 (S.D.W.Va.1972); 1 *Moore's Fed.Practice* ¶ 0.92[1]. Embodied in this principle is basic practicality. Jurisdictional determinations would otherwise have to await the outcome of trial on the merits in which counterclaims, set-offs, etc. may or may not be raised and, even if raised, may ultimately be demonstrated to be invalid. 1 *Moore's Fed.Practice* ¶ 0.92[1]. The language of the Tucker Act and related code provisions strongly suggest resort to similar principles in the present actions.

As previously mentioned, the Tucker Act, 28 U.S.C. § 1346(a)(2), confers upon the district courts original jurisdiction, concurrent with the Court of Claims, over certain "civil action[s] or claim[s] against the United States, not exceeding $10,000 in amount." The Act further provides, in pertinent part, that

> The jurisdiction conferred by this section includes jurisdiction of *any set-off, counterclaim, or other claim or demand whatever on the part of the United States against any plaintiff* commencing an action under this section. 28 U.S.C. § 1346(c) (Emphasis supplied).

The distinct concepts of plaintiffs' claims and the counter-demands of the United States, at once evident in the above subsections, are further reflected in parallel provisions of the Tucker Act and Judicial Code relating to Court of Claims jurisdiction. In direct contrast to section 1491, which states that "[t]he Court of Claims shall have jurisdiction to render judgment upon any claim against the United States . . . .," is the following language of section 1503:

> The Court of Claims shall have jurisdiction to render judgment *upon any set-off or demand by the United States against any plaintiff* in such court. (Emphasis supplied).

Further evidence of that differentiation is present in section 2508, dealing with procedures in the Court of Claims, wherein it is stated:

> Upon the trial of any suit in the Court of Claims in which *any set-off, counterclaim, claim for damages, or other demand is set up on the part of the United States against any plaintiff* making claim against the United States in said court, the *court shall hear and determine such claim or demand both for and against the United States and plaintiff * * *.* (Emphasis supplied).

■ These provisions also make it clear that the jurisdiction of the Court of Claims or district court over the United States' counterclaims, set-offs, etc. is, in a sense, ancillary to jurisdiction over the plaintiffs' claims. Thus, if there is no jurisdiction over the plaintiffs' claim against the United States, the Government's counterdemand falls with it. *Baltimore & Ohio Ry. Co. v. United States,* 34 Ct.Cl. 484 (1899); *Boehm v. United States,* 21 Ct.Cl. 290 (1886); *Mulholland v. United States,* 361 F.2d 237, 175 Ct.Cl. 832 (1966). Consequently, the only "claims" which are apposite in determining whether jurisdiction is present under the Tucker Act are the plaintiffs' monetary claims against the United States. *See Eastport S. S. Co. v. United States,* 130 F.Supp. 333 (Ct.Cl.1955); *Baltimore & Ohio Ry. Co. v. United States, supra; Boehm v. United States, supra; Flying Tiger Line, Inc. v. United States,* 170 F.Supp. 422, 145 Ct.Cl. 1 (1966); *Mulholland v. United States, supra; Corbino v. United States,* 488 F.2d 1008, 203 Ct.Cl. 278 (1973); *Maco Warehouse Co. California v. United States,* 169 F.Supp. 494, 144 Ct.Cl. 538 (1959). In our opinion, it stands to reason that the amount of a plaintiff's claim, unaided and undiminished by possible counterclaims, set-offs and other demands of the United States, must be dispositive of the question of jurisdictional amount under the Tucker Act. Insofar as the complaint goes beyond

a statement of plaintiff's monetary claim and anticipates or replies to possible government counter-demands, it will not avail as a basis of jurisdiction. *Cf. Gully v. First National Bank,* 299 U.S. 109, 112–13, 57 S.Ct. 96, 81 L.Ed. 70 (1936); *The Fair v. Kohler Die Co.,* 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716 (1933); *Taylor v. Anderson,* 234 U.S. 74, 75, 34 S.Ct. 724, 58 L.Ed. 1218 (1913).

■ Since the monetary claims of the individual plaintiffs in these cases are for back pay and allowances which in each instance exceeds $10,000 in amount, we conclude that they are beyond the Tucker Act jurisdiction of this court and lie within the exclusive jurisdiction of the Court of Claims.

### V

We move our attention to plaintiffs' contention that alternative bases for district court jurisdiction exist in the Administrative Procedure Act [APA], 5 U.S.C. § 701 *et seq.,* general federal question jurisdiction, 28 U.S.C. § 1331, the Declaratory Judgments Act, 28 U.S.C. § 2201–02, the Privacy Act, 5 U.S.C. § 552a, and the Mandamus Act, 28 U.S.C. § 1361. We conclude that none of those alternative jurisdictional provisions will permit maintenance of the present litigation in the district court.

During the period in which these cases have been under submission, the Congress enacted Public Law 94–574, 90 Stat. 2721 (1976), [the Amendments] which made several significant changes in the APA and section 1331 of Title 28.

The Amendments revised judicial review provisions of the APA, 5 U.S.C. §§ 702, 703, partially waiving the doctrine of sovereign immunity in suits against the United States, its agencies, officers and employees "seeking relief other than money damages". Section 1 of the Amendments also includes the following limitation:

Nothing herein . . . (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

Since we have earlier held that the United States has expressly consented to suits of the present nature in the Court of Claims, in which exclusive jurisdiction is vested under 28 U.S.C. § 1491, that limited waiver of sovereign immunity is, by its terms, inapplicable.

Section 2 of the Amendments eliminated the amount in controversy requirement for federal question actions against the United States, its officers, or employees. Even after amendment, however, it cannot be said that section 1331 constitutes "a waiver of the sovereign immunity doctrine under which the United States, as a sovereign, is immune from suit save as it consents to be sued," in actions *essentially* seeking money judgments against the United States. *Cf. Committee to Establish Gold Standard v. United States,* 392 F.Supp. 504, 505 (S.D.N.Y.1975); *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); *Beale v. Blount,* 461 F.2d 1133, 1138 (5th Cir. 1972).

■ Consequently, neither the APA nor section 1331, as recently amended, will avail as a basis for jurisdiction in the present cases.[17]

■ The Declaratory Judgments Act, also relied upon by plaintiffs, plainly does not confer jurisdiction upon the district courts where it does not otherwise exist. *See Continental Bank & Trust Co. v. Martin,* 112 U.S.App.D.C. 354, 303 F.2d 214 (1962); *Consumers Union of United States, Inc. v. Consumer Product Safety Commission,* 400 F.Supp. 848 (D.D.C.1975); *Boraks v. Wilson,* 383 F.Supp. 195 (D.D.C.1974); *Senate Select Committee on Presidential Campaign Activities v. Nixon,* 366 F.Supp. 51 (D.D.C.1973).

---

17. In addition, the Supreme Court has recently decided that the APA judicial review provisions, as amended by Public Law 94–574, § 1, do not constitute an implied grant of subject matter jurisdiction. *Califano v. Sanders,* 430 U.S. 99, 106, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). *See also Carter v. Seamans, supra* at 776.

■ The Privacy Act's jurisdictional provisions are likewise inapplicable, for the reason that plaintiffs have not exhausted, nor for that matter initiated, available administrative remedies under the Act. *See* 5 U.S.C. § 552a(g)(1).

■ Finally, plaintiffs suggest that mandamus jurisdiction may be invoked in this case. Although there appears to be authority for the proposition that mandamus jurisdiction is available as to non-monetary aspects of back pay cases in the district court,[18] its exercise here would seem to be inappropriate in light of the availability of an alternative adequate remedy in the Court of Claims under 28 U.S.C. § 1491. Moreover, mandamus would tend to critically undermine the exclusive jurisdiction of the Court of Claims over plaintiffs' monetary claims against the United States. *See Carter v. Seamans, supra* at 773–75; *McClendon v. Blout, supra* at 383; *Mathis v. Laird, supra* at 943–44.

### VI

On the basis of the foregoing, it is, by the Court this 30th day of March, 1977,

ORDERED that the complaints herein should be, and the same hereby are, dismissed as moot with respect to plaintiffs Ralph S. Bryner and Jimmie R. Eckard. And it is further

ORDERED that these consolidated actions should be, and the same hereby are, transferred to the Court of Claims pursuant to 28 U.S.C. § 1406(c).

18. *See e. g., Melvin v. Laird, supra; Carter v. Seamans, supra* at 773–74.